IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BETH L. WHITTAKER,

    Plaintiff,

vs.                                                        No. CIV 98-1458 LH/RLP

PRESBYTERIAN HEALTHCARE
SERVICES, INC.,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment (Docket No. 34), filed September 28, 1999. The Court, having considered the memoranda submitted by the parties and otherwise being fully advised, finds that the motion is well taken and shall be **granted.**

Plaintiff, a hospice nurse, alleges that Defendant Presbyterian Healthcare Services, Inc. (PHS) terminated her employment in violation of the Americans with Disabilities Act (ADA) and the New Mexico Human Rights Act (NMHRA). Plaintiff's alleged disability is Obsessive Compulsive Disorder (OCD): she feels the sensation of a foreign object in her eye which causes her to pick at her eye to remove the "object." Plaintiff seeks reinstatement to her position of employment with Defendant, damages for lost wages and fringe benefits, compensation for damage to her professional reputation, and for anxiety, emotional distress, costs and attorney fees.



# UNDISPUTED FACTS

1. In November 1997, Plaintiff Beth Whittaker began working at PHS Hospice on a PRN[1] basis in its out-patient unit. In January 1998, Plaintiff transferred to the in-patient unit. (Plf.'s Dep. at 78-80.)

2. The in-patient hospice unit admits clients who are terminally ill with a prognosis of less than six months to live. Most clients are admitted for pain management and respite care. (Van Horn Aff. ¶ 3.)

3. When working out-patient, a nurse goes to the homes of clients, cares for them and then leaves after a one- or two-hour visit. When working in-patient, a nurse is generally tending to one of her several clients continuously throughout her shift. It is not unusual for hospice nurses, especially in-patient nurses, to feel stressed and need a break from the hospice surroundings. (*Id.* ¶ 4.)

4. Upon being hired at PHS, as part of her post-hire physical, Plaintiff completed a medical and occupational history questionnaire signed and dated November 18, 1997. (Ex. J to Def.'s Mem.; Pl.'s Dep. at 76-77.) On page 2 of the form, Plaintiff indicated that she was under the care of a physician for "very well controlled OCD (obsessive-compulsive disorder)." *Id.* Under "Review of Symptoms" on page 4, No. 16, "emotional or mental problems," Plaintiff checked the "no" box and wrote "controlled OCD." *Id.* On page 3 under the same section, No. 6, "Problems with eyes or vision," Plaintiff wrote "OCD (well controlled, signs and symptoms for me are picking

---

[1] PRN employees work as needed and are not guaranteed any hours. (Van Horn Aff. ¶ 7.)

at right eye, foreign body sensation)." *Id.* Plaintiff signed this form underneath the following language:

> I certify the information contained in this record is correct and complete to the best of my knowledge and belief. I understand that knowingly making a false statement in this record shall be deemed sufficient cause for rejection of my application or dismissal after employment, and forfeiture of any and all workers' compensation benefits which I may be entitled to pursuant to law. I understand that Presbyterian Healthcare Services will rely on this Medial [sic] and Occupational History.
>
> I AUTHORIZE PRESBYTERIAN HEALTHCARE SERVICES, NOW AND IN THE FUTURE, TO OBTAIN ANY MEDICAL RECORDS WHICH ARE REASONABLY RELATED TO MY ABILITY TO DO MY JOB.
> I HAVE READ AND UNDERSTAND THE ABOVE STATEMENT.

5. Plaintiff testified that she read the foregoing paragraph and the information that she put on the form was true and correct. (Pl.'s Dep. at 76-77.) When asked what she meant by "well-controlled" she said, "I meant that I didn't have problems with compulsive behavior on the job." *(Id.* at 78.)

6. Plaintiff's doctor, Dr. Peters, agreed that when Plaintiff began work at PHS in November 1997 and filled out the Employee Health Questionnaire, that her symptoms were "well controlled." (Peters Dep. at 52.)

7. At a meeting on March 27, 1998, Plaintiff's supervisors informed her that they were taking her off the PRN schedule. (Van Horn Aff. ¶ 11; Pl.'s Dep. at 112.) Plaintiff had earlier indicated that "this was becoming a stressful time" and requested a meeting to look at ways to minimize stress. (Pl.'s Dep. at 92.) One of Plaintiff's supervisors told her that they were taking her off the schedule so she could take care of herself. (Pl.'s Dep. at 112.)

8. On March 27, 1998, Plaintiff saw the Employee Assistance Professional (EAP), Adam Stern, and filled out the client intake information listing her employer as "Presbyterian." She

listed herself as being "PRN." Under job status, Plaintiff put a question mark; the box next to terminated was not checked. (Ex. 1 to Stern Dep.)

9. On April 2, 1998, Plaintiff told a counselor, Theresa Miller, Ph.D., that she was working for "Hospice Pres. H.C." (Miller Dep. at 23.)

10. In April 1998, Plaintiff applied for work with HealthSouth. (Pl.'s Dep. at 56.) On her application with HealthSouth, Plaintiff listed her employment with Presbyterian as "11/97 - Present." Under "Why did you leave?" Plaintiff wrote, "I'm not getting enough hours." (Pl.'s Dep. at 59.) Plaintiff was asked in her deposition about this reference. She claimed that she wrote "present" because she had seen PHS' EEOC response and was aware that PHS did not consider her to be terminated." (Pl. Dep. at 58-59, 62-63.)

11. In April 1998, Plaintiff secured PRN work as a rehab nurse at HealthSouth making $19.00, plus shift differentials for weekend work. As a PRN employee, Plaintiff did not receive benefits and her hours of work per week varied. (Ans. to Interrog. No. 2 to PHS's Second Set of Interrogs.; Pl.'s Dep. 63-64.) Plaintiff is still employed with HealthSouth. (Ans. to Interrog. No. 2 to PHS's Second Set of Interrogs.)

12. On April 10, 1998, Plaintiff filled out an application for employment at Sandia Hospice. (Ex. 1 to Ratcliff Aff.) Plaintiff listed her employment with Presbyterian as being "11/97 - Present." Under reason for leaving, she wrote, "have Not left but need more hours." (*Id.*)

13. On April 13, 1998, two weeks after Plaintiff was temporarily removed from the PRN schedule at PHS, Plaintiff began working PRN as a hospice nurse at Sandia Hospice. (Def.'s Mem. at 8 ¶ 27; Pl.'s Resp. at 2 ¶ 1.) Plaintiff was paid $20.00 per hour, without benefits. (Ratcliff Aff. ¶ 3.) She worked an average of 40 hours per week. (Pl.'s Dep. at 41.)

14. Plaintiff signed her EEOC charge on April 9, 1998. She did not check the box requesting that the charge be filed with the State agency (New Mexico Human Rights Division). (Ex. 22 to Pl.'s Dep.)

15. Plaintiff did not receive any determination or Notice of Right to Sue from the New Mexico Human Rights Commission. (Pl.'s Dep. at 139-140.)

16. PHS's EEOC response is dated May 27, 1998, four to six weeks after Plaintiff filled out the applications at HealthSouth and Sandia Hospice. The notation on the EEOC's copy on page 1 of the response is that the Claimant (Plaintiff) reviewed the information in the response on June 11, 1998, two months after her application to HealthSouth and Sandia Hospice. (Ex. I to Def.'s Mem.)

17. During the period from 1981 to 1999, Plaintiff has worked as a nurse in a shock trauma center, for a critical care ambulance service, for a home health care operation, for in-patient and out-patient rehab, and in case management. She has been a hospice nurse for Lovelace, PHS, Sandia Hospice and HealthSouth, and a supervisor for Integrated Specialty Hospital. Plaintiff has been able to perform all essential functions of these positions. (Pl.'s Dep. at 15-21, 25-33, 39-43, 56, 63-68; Ex. F to Def.'s Mem.)

18. Plaintiff testified that her condition is "manageable with medications and therapy." (Pl.'s Dep. at 11.)

19. Plaintiff testified that the OCD interferes with "pretty much any activity including sleep, meals [and] social interaction". (Pl.'s Dep. at 12.) The behavior interferes with these activities on those occasions and during the period she is engaged in eye-picking behavior, which is usually in the morning at home. *(Id.* at 12-13.)

20. In December 1998, Plaintiff was no longer PRN at Sandia Hospice, but was hired on full-time; she was still being paid $20.00 per hour (plus overtime) but now had full benefits, including health and life insurance, eight paid holidays, plus 15 paid days off. (Pl.'s Dep. at 46; Ratcliff Aff., ¶ 5.)

21. Plaintiff was subsequently hired on June 4, 1999 as a full-time health supervisor at Integrated Specialty Hospital making $27.34 per hour (plus a shift differential of 64 cents per hour). Plaintiff also receives employer-contribution health insurance, life insurance, dental, vision, paid days off, 401-K, flexible spending account and a stock purchase plan. (Plf.'s Dep. at 65-66.)

## PRIMA FACIE CASE OF DISABILITY DISCRIMINATION

Defendant argues that the Plaintiff cannot establish a prima facie case of disability discrimination or rebut that the Defendant had legitimate nondiscriminatory reasons for its actions.

**Analytical Framework**

In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). After establishment of a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision. *Id.* If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason is pretextual, i.e. unworthy of belief. *Id.* Demonstrating pretext gets the plaintiff over the hurdle of summary judgment. *Id.*

**Prima Facie Case**

To establish a prima facie case under the ADA, a plaintiff must demonstrate:

1. that she is a disabled person within the meaning of the ADA,

2. that she is qualified, that is, she is able to perform the job, with or without reasonable accommodation, and

3. that the employer terminated her employment under circumstances which give rise to an inference that the termination was based on her disability.

*Id.* at 1323.

**Was Defendant Disabled?**

Under the ADA, the term "disability" means a physical or mental impairment that substantially limits one or more of the major life activities of an individual. 42 U.S.C. § 12102(2)(A).[2] Consideration of this definition proceeds in three steps. *Poindexter v. Atchison, Topeka and Santa Fe Ry. Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999) (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)).

1. Determine whether the plaintiff has an impairment.

2. Identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA.

3. Determine whether the impairment substantially limited the major life activity.

*Id.*

---

[2]Of course, as discussed below, "disability" also includes being "regarded as" having such an impairment, or having a "record of" such an impairment. 42 U.S.C. § 12102(2)(C), (B).

The Plaintiff does have an impairment. The regulations implementing the equal employment provisions of the ADA define "mental impairment" as any mental or psychological disorder. 29 C.F.R. § 1630.2(h)(2). The Plaintiff has Obsessive Compulsive Disorder which is listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). (Pl.'s Response at 3-4, 13-15.)

The Plaintiff claims that her OCD "interferes with any activity such as sleep, eating, social interaction, or any other activity of daily living . . ." including working morning shifts. (Pl.'s Response at 3, 7.) These constitute major life activities within the meaning of the ADA. The EEOC regulations define "major life activities" as meaning functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i).

The third step is to determine whether the impairment substantially limited the major life activity. Under the ADA, "substantially limits" means unable to perform or *significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the average person in the general population. Id.* § 1630.2(j) (emphasis added). Factors to be considered in determining whether a person is substantially limited in a major life activity include: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the actual or expected permanent or long term impact of or resulting from the impairment. *Id.* § 1630.2(j).

The Plaintiff provides some information relevant to the factors to be considered under "substantial limitation." The Plaintiff testified that with medical management of the condition, the compulsive behavior occurs between once every two weeks to four to five times per week, with the

duration ranging from one or two minutes to a number of hours. (Pl.'s Dep. at 12.) The compulsive behavior usually occurs in the morning. *(Id.* at 13.) The Plaintiff testifies that the compulsive behavior "interferes with" life activities because she is unable to physically stop herself from the compulsive behavior. *(Id.* at 12.) The Plaintiff also testified that her condition is manageable with medications and therapy. (Pl.'s Dep. at 11.) While her OCD does interfere with major life activities, the Plaintiff's impairment does not rise to the level of substantially limiting any of the major life activities within the meaning of the ADA.

Plaintiff has not established that her impairment substantially limits her major life activity of working. When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that a plaintiff alleges that s/he is unable to work in a broad class of jobs. *Sutton v. United Airlines, Inc.*, 199 S.Ct. 2139, 2151 (1999); *see* 29 C.F.R. § 1630.2(j) ("'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities"). If jobs utilizing an individual's skills are available, one is not precluded from a substantial class of jobs. *Sutton*, 199 S.Ct. at 2151; *see* 29 C.F.R. § 1630.2(j) (The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working).

Plaintiff has shown no such limitation. Despite her allegations that the OCD adversely affects her ability to attend work in the morning (Pl.'s Response at 6), Plaintiff testified that she never experienced an episode of eye-picking at work while she was employed by the Defendant. (Pl.'s Dep. at 165.) The adverse effect of OCD on her ability to attend work in the morning appears to be that the OCD causes her to occasionally arrive a few minutes late to work, i.e., she was only

a few minutes late on eight of 107 days, or about 7 percent of the time, less than one day per pay period. (Pl.'s Dep. at 134.) Both Plaintiff and her doctor stated that she is able to work as a nurse. (Peters Dep. at 17-18, 57; Undisputed Fact Nos. 11, 17.) In fact, Plaintiff was employed as a nurse prior to and after her employment by the Defendant; during each job she had OCD. (Undisputed Fact No. 17.) Here the Plaintiff does not allege, nor does it appear from the facts, that she is unable to work in a broad class of jobs. Furthermore, Plaintiff is fully able to work in the specific job she previously had at PHS. For these reasons, I conclude that Plaintiff is not disabled as defined by the ADA.

**Did Defendant Regard Plaintiff As Being Disabled?**

As stated above, the term "disability" also includes *being regarded as having* a physical or mental impairment that substantially limits one or more of the major life activities of an individual. 42 U.S.C. § 12102(2)(C). An employer runs afoul of the ADA when it makes an employment decision based on a mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. *Sutton*, 119 S.Ct. 2150. However, an employer is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job. *Id.*

The Plaintiff makes a one sentence argument that "the facts of this case show that [Defendant's action] was clearly the result of their regarding the Plaintiff [as disabled]. (Pl.'s Resp. at 15.) The Plaintiff fails to show that the Defendant regarded her as disabled under the ADA because she has not demonstrated that the Defendant perceived her as substantially limited by her OCD in any major life activities including working. Although Plaintiff testified that her supervisor told her the new position was no longer available because of her OCD (Pl.'s Dep. at 108), the most

-10-

the Plaintiff could factually establish is that the Defendant regarded her OCD as limiting her ability to perform one particular job. An impairment that an employer perceives as limiting an individual's ability to perform only one job is not a handicap under the ADA. *Welsh v. City of Tulsa*, 977 F.2d 1415, 1419 (10th Cir. 1992).

The Plaintiff cites *Holihan v. Lucky Stores, Inc.* in which the court held that strong encouragement by the employer that the employee seek counseling through the Employee Assistance Program, along with several doctor's reports diagnosing the employee with depression, anxiety and stress, was sufficient basis for a reasonable jury to infer that the employer regarded the employee as suffering from a disabling mental condition that substantially limited his ability to work. 87 F.3d 362, 366 (9th Cir. 1996). However, the facts in *Holihan* differ significantly from those in this case.

First, Holihan was strongly encouraged to seek counseling. He was given the choice of either a suspension pending an investigation or a leave of absence if he contacted the EAP for counseling. Plaintiff was not strongly encouraged to seek counseling for her OCD. EAP was not contacted until after she responded, to a question of whether she was suicidal, that she was aware that suicide is always available as an option. (Pl.'s Dep. at 110.) The Plaintiff in this case does not allege that she was encouraged to seek counseling because of her OCD. Second, Holihan had been diagnosed as partially pyschiatrically disabled from his job. *Holihan*, 87 F.3d 362, at 364. In addition, another of Holihan's doctors recommended against his returning to work. *Id.* Here, the Plaintiff's doctor did not state that she was disabled but rather stated that she was able to work as a nurse. Peters Dep. at 17, 57. Third, Holihan's employer fired him after he had been on medical leave for over six months. Nothing in the record indicates that the Plaintiff in this case took any medical leave at all while employed by the Defendant.

-11-

To support her claim that the Defendant regarded her as having an impairment that substantially limits the major life activity of working, Plaintiff must, but does not, allege that the Defendant regarded her as unable to perform a broad class of jobs. *See Sutton*, 119 S.Ct. at 2151. Alleging only that the Defendant regarded her OCD as precluding her from performing a single, particular job will not support the claim that the Defendant regarded Plaintiff as having a substantially limiting impairment. *Id.* ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") (*quoting* 29 CFR § 1630.2(j)(3)(i)); *See also Sorenson v. Univ. Utah Hosp.*, 1999 WL 820213, *5 (10th Cir. 1999) (An allegation that an employer regards an employee's impairment as precluding her from holding a single job does not support the claim that the employer regards the employee as having a substantially limiting impairment.).

**Nondiscriminatory Reason for Defendant's Action Not Rebutted as Pretextual**

Even if I were to conclude that Plaintiff had established a prima facie case, she has not met her burden of showing that there exists a genuine issue of material fact as to whether the alleged "termination" was pretextual. Once the defendant employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason is pretextual, i.e. unworthy of belief. *Morgan v. Hilti, Inc.*, 108 F.3d at 1323.

Plaintiff alleges that she was "effectively" terminated because she was never called back to work and was not given the full-time position that she allegedly had been promised. (Pl.'s Resp. at 16.) Defendant has come forward with a nondiscriminatory reason for its actions, namely to give the Plaintiff time off to rest after she voiced that she was stressed. (Van Horn Aff., ¶ 10.) Plaintiff

did meet with her supervisor on the day of the alleged termination and indicated that it "was becoming a stressful time" and that she had requested a meeting "to look at ways to minimize stress." (Pl.'s Dep. at 92.) Plaintiff admits that "This is not a case of pretext, . . . ." (Pl.'s Resp. at 16.)

## EXHAUSTION OF ADMINSTRATIVE REMEDIES

Defendant claims that the Plaintiff cannot maintain an action under the New Mexico Human Rights Act because she has not exhausted her administrative remedies under the NMHRA. The Plaintiff agrees that the claims under the NMHRA should be dismissed. (Pl.'s Resp. at 18.)

## CONCLUSION

The Plaintiff has not established a prima facie case. Even if she could prove a prima facie case, the Plaintiff has not rebutted the Defendant's nondiscriminatory reason for its employment decision. Therefore, the motion for summary judgment shall be granted.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 34), filed September 28, 1999, is **granted.**

UNITED STATES DISTRICT JUDGE

-13-